Filed 6/26/13  P. v. Yanez CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br> v.<br><br>DANIEL YANEZ,<br><br>  Defendant and Appellant. | B244668<br><br>(Los Angeles County<br>Super. Ct. No. GA081747) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed.

David Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Daniel Yanez appeals from the judgment entered following his convictions by jury on count 1 – stalking (Pen. Code, § 646.9, subd. (a)), count 2 – felony child molesting (Pen. Code, § 647.6, subd. (b)), count 3 – first degree residential burglary (Pen. Code, § 459), and count 4 – misdemeanor child molesting (Pen. Code, § 647.6, subd. (a)(1)). The court sentenced appellant to prison for six years eight months. We affirm the judgment.

## *FACTUAL SUMMARY*

The evidence established that in June 2010, 16-year-old Lauren G. (Lauren) was a junior at Duarte High School and a member of the school's cross-country team. A. G. (A.), her brother, was the team's assistant coach. One day in June 2010, Lauren, A., and her team were on a bike trail that the team frequently used. Lauren usually wore a T-shirt, sports bra, and running shorts when running.

Appellant, 47 years old, approached and talked with Lauren, A., and the team about running. Appellant had a heavy Spanish accent. Later in June 2010, Lauren, A., and the team were again on the trail. Appellant spoke with A. Lauren subsequently saw appellant more frequently. Appellant asked A. if appellant could run with the team, and A. agreed appellant could do so.

Lauren saw appellant two or three times a week when the team ran on the trail. Lauren and appellant usually ran with a slower group, but eventually he ran only with Lauren. When appellant ran with the team, he focused his attention on Lauren. At some point Lauren told appellant she was 16 years old. Appellant did not attend team races.

When appellant began running with Lauren only, he told her she needed to continue running because it was good for her. He also told her she was a great person and really sweet. Appellant initially talked mostly about running. He later began talking about his life, and he told Lauren his life story a few times.

The conversations became more personal. Appellant told Lauren if she were 18 years old "he could spend time with [her] because then it wouldn't be a problem."

2

Appellant called her Angel and Barbie a number of times and told her she was pretty. This made Lauren very uncomfortable.

Christian F. (Christian) was another cross-country team member. Lauren was running only with Christian at the time appellant called her Barbie. Appellant told Lauren that appellant did not like Christian, appellant did not like all the time she spent with Christian, and Christian was not a "good guy" for her. Appellant told Lauren it bothered him or made him jealous when she talked with other boys. These comments made Lauren very uncomfortable. At one point, appellant hugged Lauren.

During June and July of 2010, appellant repeatedly called Lauren's home in Baldwin Park. A. had given the home telephone number to appellant. The phone rang three or four times daily, and when a family member answered, appellant would hang up. Appellant told Lauren he hung up because he did not want anyone else to know he was calling. Lauren spoke with appellant on the phone three times. She then stopped answering the phone because appellant made her feel uncomfortable. Los Angeles Sheriff's Deputy Robert MacLean testified Lauren told him that when appellant made phone calls, she "felt like the defendant was hitting on her," but MacLean did not recall "her saying anything explicitly sexual." At some point Lauren became afraid of appellant.

In late June of 2010, appellant went to Lauren's home. He brought sports magazines for her and A. Lauren was surprised and uncomfortable when appellant arrived. Lauren had not given appellant her address. Appellant claimed he had obtained it from neighbors.

During the summer of 2010, appellant told Lauren that, on a certain day, he had seen her sitting on the couch in the living room of her home. She in fact had been sitting on the couch that day. He also told her that on another occasion he had seen her outside her house with people. Lauren told A. she did not like appellant. In August 2010, Lauren told Christian and A. that appellant had called her Angel.

3

Christian testified as follows. In 2010, he was 15 years old. When appellant was on the above mentioned bike trail, he spoke mostly with Lauren. Christian became concerned appellant was "getting a little too close" with Lauren. Appellant kept trying "to hang out with her or get her to . . . run with him alone." Appellant initially talked with Lauren about running, but later talked with her about the fact "he was by her house and wanted . . . to go run with her."

Christian testified when appellant spoke with Lauren on the bike trail during June 2010 and the summer of 2010, appellant would stare at her and tell her she looked pretty. Lauren appeared to be uncomfortable. Appellant told Lauren that one day the two should run together, but Lauren said no.

Christian told Lauren about his concern appellant "was just getting too close and creepy." Christian had been Lauren's friend for about two years and could tell by Lauren's facial expressions she was uncomfortable in appellant's presence. During the middle of July 2010, Lauren told Christian she felt uncomfortable with appellant.

Christian also testified as follows. Appellant's body language towards Lauren was "becoming too close and creepy" and indicated "he was checking [her] out." Christian could tell by appellant's facial expressions, his body language, and the way appellant looked that appellant was not concerned about what appellant was talking about, appellant was not concerned about running, but appellant was concerned about something else.

During recross-examination, Christian denied appellant said anything sexual to Lauren, and Christian indicated Christian's interpretation of how appellant looked at Lauren was based on what Christian thought appellant might be thinking. The following then occurred during appellant's recross-examination of Christian: "Q [Appellant's Counsel]: In other words, [Lauren] is saying, 'Hey, this is just a dirty old man'? [¶] A Yes." The following also occurred: "Q [Appellant's Counsel]: Well, you are saying the way [appellant] was looking at her, in your mind was he undressing her with his eyes? [¶] A In a way, yes."

4

On September 10, 2010, Eric Barba, the school principal, received a call from a man identifying himself as Jose. Jose told Barba pornography, glue tabs, clothing, drugs, and undergarments were on one of the school's playing fields. Jose said Lauren was engaging in acts of prostitution, and Christian was selling drugs, at that location. Jose spoke in broken English and had a Spanish accent.

John Cantrell, head of the school's security, went to the field that morning and found women's undergarments, swim shorts, a white T-shirt, and a long-sleeved shirt. He also found an open condom, two bags containing gel-like substances, and pornography. That same day, Barba showed to Lauren items Cantrell had found. Lauren recognized the T-shirt as the one appellant had worn every time she had seen him running. She had never seen the other items. Christian also recognized the T-shirt as belonging to appellant, and Christian recognized another shirt appellant had worn. Deputy MacLean went to the school that day regarding the matter.

Lauren testified that after September 10, 2010, she stopped running because she was afraid of appellant. She also stopped sleeping in her bedroom and, a few times, she slept with a knife under her pillow. When Lauren was at home, she changed clothes in the bathroom because she was afraid appellant might be watching her.

On September 13, 2010, MacLean saw appellant on the school's field and approached him. Appellant told MacLean the following. Appellant was there to watch his niece, Sarah Gonzalez, run on the cross-country team. Appellant was trying to coach Gonzalez.[1] Appellant was glad MacLean was there because strange things had been found lately on the field. On the previous Wednesday, appellant and other men had been walking on the field when they found pornography, condom wrappers, and packages containing glue. One of the men called the school on Friday to report the incident but nothing had been done. When appellant made calls generally, he used a pay phone.

---

[1]    MacLean testified the cross-country team coach told him there was a team member named Sarah Gonzalez but, after the beginning of August 2010, Gonzalez had not been practicing with the team. MacLean later determined Sarah Lopez was the only person named Sarah on the team.

Sarah Lopez testified as follows. Lopez was the only cross-country team member whose first name was Sarah. During the period from June 2010 through the fall of 2010, Lopez saw appellant run sometimes with the team. Lopez was not appellant's niece, and appellant had never trained or helped Lopez.

Lauren testified that on October 18, 2010, Lauren was running on the Santa Fe Dam near her home. She did not run on the previously mentioned bike trail because she did not want to see appellant. At the dam, Lauren saw appellant approaching, she stopped because she was afraid, but appellant ran to her. Lauren kept running but appellant ran next to her.

Appellant told Lauren the following. Appellant was sorry for what had happened during the "first incident" at the school and "for what that person said on the phone." Appellant had called Lauren's house on more than one occasion and had hung up when her sister answered the phone. Appellant just wanted Lauren to hear him out, "he didn't mean for any of that," and he "was sorry about what [Lauren's] mom must be going through."

Lauren repeatedly asked appellant to leave her alone, but he continued running with her almost two miles. When they reached Lauren's street, she asked appellant to leave her alone. Appellant left. Lauren ran home as fast as she could, afraid appellant might pursue her. When she arrived home, she began crying and told her father what had happened.

Lauren testified she told MacLean the following. During the October 18, 2010 incident, appellant told Lauren, " 'It wasn't me, I didn't do it.' " She had never spoken to appellant about the September 10, 2010 incident. Appellant apologized to Lauren and said he just wanted to be friends.

On November 18, 2010, appellant called the school. Christine F. (Christine), a school office employee and the mother of Christian, answered the phone. Christine recognized appellant's voice as that of "Jose" who had called on September 10, 2010. Appellant indicated Christine should take "real good note[s]" and he told her the

6

following. Lauren was a very bad girl and was coming outside at night and having sex in cars in the driveway of her house. Appellant had seen Lauren with a few males and had seen a car that had frequented her house. Appellant had a videotape, and Lauren's panties and condoms were in her yard. Appellant was aware of the above information because he was a friend of someone "across the street or something."

Christine's phone had caller ID. It displayed the same number displayed during the September 10, 2010 call. She gave the phone number to MacLean. Police traced the number to a Baldwin Park pay phone.

On November 18, 2010, Baldwin Park Police Officer Jose Jimenez went to the pay phone and saw appellant standing in front of it. When appellant saw Jimenez arrive in his police car, appellant began walking away but Jimenez detained him. Appellant was carrying papers reflecting Lauren's home address, a license plate number belonging to a car that had been parked in the driveway of her home that morning, and the phone number for the office of the Duarte Unified School District. If someone called that office, the office could transfer the call to Lauren's school.

Lauren testified that on November 18, 2010, after she arrived home from school, she saw her underwear in the street outside her house. No one was at home. The underwear had been in her bedroom the day before. Lauren, afraid, called the school and reported the matter. That day, a detective went to Lauren's house, retrieved the underwear, and a condom and condom wrapper fell out of the underwear. Lauren had never previously seen the condom or wrapper. She had not given anyone permission to enter her bedroom and take the underwear. Lauren noticed her bedroom window had been opened, although it normally was closed.

Barba testified that during evenings once or twice a week, he would walk the trail used by the cross-country team. Barba would usually see appellant running. On about half of those occasions, it seemed appellant was trying to talk with females. Appellant presented no defense evidence.

7

Appellant claims the trial court erred by giving CALCRIM No. 370 to the jury.

***DISCUSSION***

*The Trial Court Did Not Prejudicially Err by Giving CALCRIM No. 370.*

    1. *Pertinent Facts.*

    The information alleged appellant committed child molesting having entered an inhabited dwelling (count 2; Pen. Code, § 647.6, subd. (b)), a felony. After the parties rested but before the court submitted the case to the jury, the court and parties agreed the court would amend the information by adding a count (ultimately count 4) alleging child molesting (Pen. Code, § 647.6, subd. (a)(1)), a misdemeanor. The court and parties agreed count 4 would pertain to appellant's alleged conduct from June 30, 2010, through November 17, 2010, inclusive, and count 2 would pertain to appellant's alleged conduct on November 18, 2010. The court amended the information by adding the count 4.**[2]**

    The court gave to the jury CALCRIM No. 1121 as to count 2,**[3]** and CALCRIM No. 1122 as to count 4.**[4]** Each instruction stated, inter alia, "To prove that the defendant

---

**[2]**     Count 1 alleged appellant committed stalking on or between June 30, 2010, and November 18, 2010. Count 3 alleged he committed first degree residential burglary against Lauren on or about November 18, 2010.

**[3]**     CALCRIM No. 1121 stated, in relevant part, "1121. Annoying or Molesting a Child in a Dwelling (Pen. Code, *§ 647.6(a)-(c)*) [¶] The defendant is charged in Count TWO with annoying or molesting a child in an inhabited dwelling in violation of Penal Code section *647.6(b)*. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant entered an inhabited dwelling house without consent; [¶] 2. After entering the house, the defendant engaged in conduct directed at a child; [¶] 3. A normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct; [¶] 4. *The defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child*; [¶] AND [¶] 5. The child was under the age of 18 years at the time of the conduct. [¶] It is not necessary that the child actually be irritated or disturbed." (Italics added.)

**[4]**     CALCRIM No. 1122 stated, "1122. Annoying or Molesting a Child (Pen. Code, § 647.6(a)-(c)) [¶] The defendant is charged in Count FOUR with annoying or molesting a child in violation of Penal Code section 647.6. [¶] To prove that the

8

is guilty of this crime, the People must prove that: [¶] . . . [¶] . . . The defendant's conduct was *motivated* by an unnatural or abnormal sexual interest in the child." (Italics added.) CALCRIM No. 1121 was on page 9 of the written jury instructions. The court also gave CALCRIM No. 370, pertaining to motive.[5] That instruction stated, inter alia, "The People are *not* required to prove that the defendant had a *motive* to commit any of the *crimes* charged." (Italics added.)

During deliberations, the jury sent to the court a note stating, "There is a discrepancy between the Penal Code section cited in the Count 2 verdict form (PC 647.6(b)) and the instruction on page 9 (#1121) (PC 647.6 (a) – (c))." The court replied with a note stating, "Penal Code section 647.6(b) falls within Penal Code section 647.6(a) – (c) and is defined by jury instruction # 1122 [*sic*]." (Some capitalization omitted.) The jury convicted appellant as previously indicated.[6]

---

defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant engaged in conduct directed at a child; [¶] 2. A normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct; [¶] 3. *The defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child*; [¶] AND [¶] 4. The child was under the age of 18 years at the time of the conduct. [¶] It is not necessary that the child actually be irritated or disturbed. It is also not necessary that the child actually be touched." (Italics added.)

[5]    CALCRIM No. 370 stated, "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

[6]    The verdict form as to count 2 reflects the jury convicted appellant "of child molesting or annoying, in that he did unlawfully molest or annoy a child, Lauren G., under the age of eighteen years, after entering, without consent, an inhabited dwelling house or inhabited portion of a building, in violation of Penal Code section 647.6(b), as charged in Count 2 of the Information." (Emphasis, and some capitalization, omitted.)

9

2. *Analysis.*

Appellant, relying on *People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*), claims the trial court erred by giving CALCRIM No. 370. Respondent concedes the issue. However, even if there was error, we conclude it was not prejudicial.

Appellant argues the alleged instructional error was prejudicial. He argues a juror plausibly could have concluded appellant merely sought a platonic relationship with Lauren. He further argues a juror plausibly could have concluded appellant, jealous of Lauren's other relationships or upset at her rejection of his platonic overtures, became angry and engaged in sexually-related efforts to defame and humiliate Lauren, even though his conduct had never been motivated by an unnatural or abnormal sexual interest in her.[7] He also argues the jury's note to the court demonstrates prejudice.

However, appellant was 47 years old. Lauren was 16 years old. Beginning in June 2010, he slowly attempted to intertwine himself in Lauren's life, eventually running only with her. He never attended the team's races, although he might have been expected to attend one if he had had a purely platonic interest in Lauren or her running. Appellant's compliments about Lauren and about her appearance, and his increasingly personal comments to her, were efforts to groom her for later sexual purposes. Appellant told Lauren if she were 18 years old, "he could spend time with [her] because then it wouldn't be a problem." Lauren did not testify appellant then distinguished between a problem related to a platonic relationship or a sexual one, nor did she testify appellant then told her a sexually-related problem was out of the question as far as he was concerned because he wanted only a platonic relationship.

Appellant complained to Lauren about her association with Christian. Lauren did not testify appellant complained about any relationships she had with females. Lauren testified appellant said Christian was not a good "guy" for Lauren. She did not testify

---

[7]    In support of his argument, appellant cites various alleged articles and Internet secondary sources. We decline to consider them since they are not part of the record on appeal. (Cf. *People v. Barnett* (1998) 17 Cal.4th 1044, 1183.)

10

appellant said Christian was not a good "person" for Lauren. Appellant was focusing on Lauren's relationships with people of the opposite sex. Appellant told Lauren he was jealous when she talked with other boys. She did not testify he expressed jealousy when she talked with girls. At one point appellant hugged Lauren.

Appellant repeatedly called Lauren's home, hung up the phone if someone other than Lauren answered, and told Lauren he hung up because he did not want anyone else to know he was calling. This evidenced consciousness of guilt. Lauren did not testify appellant told her that he did not want anyone to know he was seeking a platonic relationship. Lauren told MacLean she felt appellant was "hitting on her," not that she felt appellant was seeking a platonic relationship. Appellant's various efforts to go by Lauren's home indicated appellant was obsessed with Lauren, not that he was seeking a platonic relationship. There is no dispute he was stalking her (count 1).

Christian testified appellant was getting too close and "creepy" with Lauren. According to Christian, appellant would stare at her and tell her she looked pretty. She rebuffed appellant's suggestion that one day they run together. Appellant's body language indicated appellant was "checking [Lauren] out" and appellant was concerned, not about what he was saying or about running, but about something else. Christian believed Lauren was saying " 'this is just a dirty old man' " and, based on the way appellant looked at Lauren, Christian believed appellant was "undressing her with his eyes."

On September 10, 2010, appellant falsely reported to the school principal that Lauren was engaged in prostitution, and Christian was selling drugs, at a campus location. Appellant left pornography and sexually-related paraphernalia at the location. On September 13, 2010, appellant told MacLean that appellant was on campus to watch Gonzalez, his niece, run. Appellant did not tell MacLaren that appellant was there to watch Lauren, as he might have told MacLaren if appellant had been seeking a platonic relationship with her. Appellant's claim he was there to watch Gonzalez was a fabrication; Lopez did not know appellant, and Lopez was the only person named Sarah

11

on the team. Appellant's fabrication evidenced consciousness of guilt as to why he was there.

On October 18, 2010, during the incident at Santa Fe Dam, appellant made conflicting statements as to whether he had been involved in the September 10, 2010 incident. This evidenced consciousness of guilt. He ignored Lauren's requests that he leave her alone and instead ran with her almost two miles. However, when he approached her street and risked being seen by people who knew Lauren, he did not accompany her further.

When appellant called the school on November 18, 2010 (as well as on September 10, 2010), he never told anyone that he knew Lauren or had a platonic relationship with her. Appellant does not explicitly dispute that on November 18, 2010, he stalked the 16-year-old Lauren (count 1), burglarized her home (count 4), and took the underwear of a girl over 30 years his junior and put it, along with a condom and condom wrapper, in the street in front of her home. Appellant committed these acts, and fabricated his previous reports and evidence of sexual misconduct on Lauren's part, in revenge for Lauren's rejection of appellant, who had been grooming her for a sexual relationship.

On November 18, 2010, appellant was at the pay phone from which he had called the school. He possessed papers reflecting information about Lauren's home and school. When appellant saw Jimenez approach in a police car, appellant began walking away. This evidenced consciousness of guilt. Barba testified he continually saw appellant trying to talk with females.

In sum, there was overwhelming evidence as to each of counts 2 and 4 that appellant's conduct was "motivated by an unnatural or abnormal sexual interest in" Lauren for purposes of Penal Code section 647.6, subdivision (b) (count 2) and subdivision (a)(1) (count 4).

12

*Maurer* does not compel a contrary conclusion. In *Maurer*, a jury convicted a male high school teacher on two counts of misdemeanor child annoyance involving a female student. (*Maurer*, *supra*, 32 Cal.App.4th at p. 1124; Pen. Code, § 647.6.) One count alleged the teacher described to the student a dream in which the teacher was caught naked with her in bed. The other count alleged he described to her an incident during which he digitally penetrated an older woman. (*Maurer,* at p. 1125.) The court gave jury instructions similar to CALCRIM Nos. 370 and 1122 in the present case. (*Maurer,* at pp. 1125-1126.) *Maurer* held the trial court erred by giving the instruction that was similar to CALCRIM No. 370. (*Maurer,* at p. 1127.)

*Maurer* also concluded the error was prejudicial. (*Maurer, supra*, 32 Cal.App.4th at p. 1129.) However, *Maurer* is distinguishable and is virtually limited to its facts. *Maurer* stated, "The evidence shows that [the student] and defendant were confidants and freely discussed sexual and nonsexual matters, sometimes in a counseling mode. [The student] frankly and openly discussed sexual matters with others. Defendant and [the student] were very close and spent a lot of time privately, yet defendant never touched her in a sexual manner and never tried to seduce her. Defendant's sexual comments were almost always made in front of the whole class, which included boys as well as girls, and were usually uttered in a joking way. As for defendant's two convictions involving [the student], one count arose from defendant joining a conversation between [the student] and [a female classmate] and offering his experience with an *older* woman. On the other count [involving the dream], [the student] said she had to pry the details out of defendant. Contrary to the Attorney General's argument, it is tenable, on *this* evidence, that a juror here could have determined that defendant's conduct was motivated by other than an unnatural or abnormal sexual interest in [the student]." (*Maurer*, *supra,* 32 Cal.App.4th at p. 1131, second italics added.)

Finally, the jury's note in the present case merely reflected the jury's concern about why CALCRIM No. 1121 (pertaining to count 2) referred to "(Pen. Code, § 647.6(a) – (c))" while the verdict form pertaining to that count referred only to "Penal Code section 647.6(b)" (some capitalization omitted). The note did not expressly refer to any juror's concern about CALCRIM No. 370, or the element reflected in CALCRIM No. 1121 that appellant's "conduct was motivated by an unnatural or abnormal sexual interest in the child." CALCRIM No. 1122 (pertaining to count 4) contained the same element; the jury posed no question about that instruction. The jury posed no further question pertaining to instructions once the court answered the jury's note. Nothing pertaining to the jury's note indicates any juror was concerned about CALCRIM No. 370. Even if the trial court erred by giving CALJIC No. 370 as to counts 2 and 4, the error was harmless beyond a reasonable doubt. (Cf. *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

### *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.                                    CROSKEY, J.